## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

GERMÁN DE PATRICIO,

    Plaintiff,

v.

TOWSON UNIVERSITY,

    Defendant.

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

Civil No. 22-01454-BAH

## MEMORANDUM OPINION

Plaintiff Germán de Patricio, Ph.D. ("Plaintiff") sued his current employer, Towson University ("Defendant" or the "University") asserting a variety of employment discrimination claims. ECF 1, at 6–16. Pending before the Court is the University's Motion for Summary Judgment (the "Motion"). ECF 26. Plaintiff filed an opposition, ECFs 39 (opposition); 40 (accompanying memorandum), and the University filed a reply, ECF 43.[1] The Court has reviewed all relevant filings, including exhibits and memoranda of law attached to the University's Motion and Plaintiff's opposition, and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). Accordingly, for the reasons stated below, the University's Motion is **GRANTED**.

---

[1] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page. Plaintiff's deposition, ECF 26-4, however, lacks consistent ECF-generated pagination, and the Court will refer to that exhibit by the internal deposition pagination.

## I.   BACKGROUND

### A.   Factual Background

Plaintiff was born in Spain in 1968, ECF 26-4 (Plaintiff Deposition), 8:17–22, and moved to the United States in 2006. *Id.* at 9:8–9. In 2010, Plaintiff was hired as an Assistant Professor of Spanish, a "tenure-track" position. *Id.* at 12:16–13:12. In "2015 or 2016" Plaintiff obtained tenure and was promoted to the rank of Associate Professor. *Id.* at 13:13–14:7. Plaintiff has been in this position since that time, *id.* at 14:4–7, though Plaintiff unsuccessfully sought promotion to the rank of Full Professor in 2020, *infra* Section I.A.4.

Plaintiff was not promoted in 2020 because the majority of members on the University's promotion committees had concerns about Plaintiff's teaching and collegiality. *Infra* Section I.A.4. These concerns stemmed from two disciplinary letters Plaintiff had received earlier in 2020, *infra* Section I.A.2, as well as a few negative student reviews, *see infra* Section I.A.4. Plaintiff opposed the inclusion of the two disciplinary letters in his promotional materials and elected to include a response to the letters for the promotion committees to review. *Infra* Section I.A.3. Plaintiff's response was also considered by the promotional committees, and the committee members concluded Plaintiff had not "drawn the right lessons," ECF 26-18, from the incidents that triggered the disciplinary letters.

Later, in September 2021, Plaintiff filed a Charge of Discrimination with the Maryland Commission on Civil Rights ("MCCR"), *infra* Section I.A.6, alleging discrimination based on his "age (52 years old), national origin (Hispanic, Spain), and disability." ECF 26-23, at 2. Specifically, Plaintiff alleged his department chair, Dr. Margherita Pampinella, "continuously subjected [him] to ageist, national origin based, disability-related, and retaliatory harassment." *Id.* at 3.

2

Regarding Plaintiff's disability allegation, Plaintiff has a medical condition that requires accommodations in his teaching schedule, *see infra* Section IA.1. Plaintiff alleges his disability is a source of Dr. Pampinella's "personal aversion" toward Plaintiff. ECF 26-16, at 2; *see also* ECF 26-4, at 99:2–11 (indicating a fear Dr. Pampinella may not honor his accommodations). Plaintiff alleges that Dr. Pampinella issued disciplinary letters against him as "an attempt . . . to jeopardize Plaintiff's promotion." ECF 40, at 13.

Ultimately, Plaintiff alleges he was subjected to retaliatory adverse employment actions after filing his MCCR Charge when Dr. Pampinella did not permit him to speak at a department meeting on December 3, 2021, and another colleague reported Plaintiff for unprofessional conduct. *Infra* Section I.A.7. The latter incident resulted in an investigation by the Office of Human Resources ("OHR") and culminated with Plaintiff receiving a new letter of warning that will be included in Plaintiff's promotional file should he seek promotion again. *Id.*

### 1.   Plaintiff's Medical Condition and Accommodations

Plaintiff "received several diagnos[e]s between 2013 and 2015" for conditions relating to the digestive system, including "diverticulitis, . . . irritable bowel syndrome . . . Crohn's disease, [and] ulcerative colitis." *Id.* at 22:18–23:2. Plaintiff's condition causes him "acute chronic pain, and uncontrollable bowel movements" in the morning, ECF 26-5 (Plaintiff's Response to Interrogatories), at 12, thereby affecting Plaintiff's ability to teach in the morning. *See id.* "From 2013 to 2019 the two [department] chairs Plaintiff had (Dr. McLucas and Dr. Lea Ramsdell, Ph.D.) understood Plaintiff's health condition and helped Plaintiff to schedule his classes after 11:30 a.m." *Id.* at 13. This was an informal arrangement and there was no formal request for accommodations. *See* 26-7 (Dr. Ramsdell Deposition), at 10, 51:7–52:9 (testifying

that "it worked out" that there "weren't conflicts" with Plaintiff teaching in the afternoons because many other professors wanted to teach in the mornings).

In late 2018 or early 2019, the incoming department chair, Dr. Pampinella suggested to Plaintiff that he consider having the University issue a formal accommodation. *Id.* at 59:21–60:20 (testifying that Dr. Ramsdell heard from Dr. Pampinella about a conversation between Dr. Pampinella and Plaintiff); ECF 26-8 (Dr. Pampinella Deposition), at 4, 21:3–6 ("I thought that if someone is in pain to a point that that impacts their ability to interact with students, I thought a conversation with HR would have been beneficial."). Plaintiff alleges that it was Dr. Ramsdell that first advised him to seek an official accommodation. ECF 26-5, at 13–14. Plaintiff alleges that Dr. Ramsdell "heard the person that was going to be the chair after the 2019 Summer, Dr. Pampinella, say that she was not going to respect Plaintiff's health condition." *Id.* at 13.

Plaintiff subsequently applied for, and received, an accommodation. ECF 26-9 (June 10, 2019, Accommodation Letter). Around June 2019, Plaintiff requested a teaching schedule that included no courses or meetings prior to 10:00 a.m. and the ability to take 30-minute breaks approximately every four to five hours to prepare and consume a special diet that was required by his condition. ECF 26-4, 23:11–24:6; *see also* ECF 26-9. The University complied with this accommodation. *See* ECF 26-10 (including Plaintiff's teaching schedule between the 2015 to 2022, indicating that all of Plaintiff's classes were scheduled after 2:00 p.m.).

In January or February of 2021, Dr. Pampinella asked Plaintiff about possibly teaching a Spanish course in the fall semester of 2021 at 11:00 a.m. ECF 26-4, at 31:1–21; ECF 26-8, at 5, 26:1–10. Plaintiff said he could not teach at that time. ECF 26-8, at 5, 26:7 (testifying that Plaintiff indicated "he could only teach at 2:00 p.m."); ECF 26-4, 31:15–20 ("I explained to the chair that that was not a possibility for me because—due to the stress I was suffering and the—I

was—the situation had worsened. My health was much worse. And I told her that I could not teach at 11:00"). Dr. Pampinella asked "if there had been any revisions to the accommodation," ECF 26-8, at 5, 26:8–10, prompting Plaintiff to seek a modification of his accommodation. *Id.* at 26:11–13.

Dr. Pampinella did not assign Plaintiff to teach a class at 11:00 a.m. while his modification request was pending. *Id.*; ECF 26-10, at 7 (indicating that in the Fall of 2021, Plaintiff's earliest class was at 2:00 p.m.). Nevertheless, Plaintiff testifies that "the class [he] was asked to teach had been originally scheduled for another instructor at 3:30 p.m." and that Dr. Pampinella "went out of her way to change this to—trying to change the time to make it as early as technically possible." ECF 26-4, at 31:4–9.

Plaintiff's updated accommodation request, approved on May 17, 2021, indicated that the University would assign courses "primarily between the hours of 2:00 pm and 5:00 pm, and no earlier than 12:00 pm." ECF 26-22, at 2. Further, if it was "necessary to assign a course between the hours of 12:00 pm and 2:00 pm," the University agreed to allow Plaintiff "to take 30 minute breaks approximately every four (4) hours, in order to prepare and consume a special diet that is required due to the qualifying condition" and the University agreed to not assign Plaintiff to more than four (4) consecutive hours of instruction to allow for these breaks. *Id.*

### 2. Student and Colleague Complaints About Plaintiff that Became a Part of Plaintiff's File

"[A]t least three different students" went to then-department chair Dr. Ramsdell to complain about Plaintiff not permitting the students to be "given their accommodations . . . that they were due for their disabilities." ECF 26-7, at 3, 19:3–6. "[A]t least four students" went to Dr. Ramsdell "to say that they felt disrespected in the classroom." *Id.* 19:6–9. In response, the University's Office of Inclusion & Institutional Equity ("OIIE") investigated, and on February

17, 2020, substantiated the allegations of Plaintiff denying two students their ADA accommodations.[2] *See* ECF 26-11 (finding by a preponderance of the evidence that Plaintiff denied student S.M. the use of a SmartPen, despite being told use of a SmartPen was permissible and "failed to provide [S.M.] with the required accommodations to allow her to take exams in a distraction free environment as well as use the laptop, both of which were [Accessibility & Disability Services ("ADS")] approved accommodations"); ECF 26-12, at 3 (finding by a preponderance of the evidence that Plaintiff "withheld accommodations" from student "I.W." by "denying her request to use a recording pen during class, which is a reasonable accommodation based on her documented disability with ADS").[3] Plaintiff had the right to appeal, ECF 26-11, at 4 (indicating right to appeal); ECF 26-12, at 4–5 (same), but did not do so. ECF 26-4, at 44:6–11. After the OIIE findings, the Dean of the University, Dr. Terry Cooney, and Dr. Pampinella issued a Letter of Warning to Plaintiff on June 26, 2020. ECF 26-13, at 2 ("Please be advised that this conduct does not meet with the expectations of instructors at Towson University."). The Letter of Warning required Plaintiff to attend remedial training on the ADA. *Id.* at 2.

Plaintiff also received a second disciplinary letter on June 26, 2020, regarding inappropriate interactions with Dr. Pampinella. *See* ECF 26-14, at 2-3. In her "Letter of Concern," Dr. Pampinella noted that Plaintiff allegedly "refus[ed] to be observed in class by Dr. Romo" and made "serious and unfounded accusations against [a] colleague[]," which Dr. Pampinella referred to as "not the acceptable professional behavior." *Id.* at 2. Additionally, the Letter of Concern stated Plaintiff's "unwarranted use of disrespectful language and tone in

---

[2] These two students also accused Plaintiff of discriminating against them on the basis of their gender and race; however, these accusations were not substantiated. *See* ECF 26-11, at 3–4; ECF 26-12, at 4–5.

[3] Defendant identifies students by initials only "[f]or purposes of compliance with the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g ("FERPA")." ECF 26-1, at 6 n.2.

[Plaintiff's] interactions with colleagues" was a "matter of concern to the effective functioning of the department." *Id.* Specifically, the Letter noted that Plaintiff "reported to [Dr. Pampinella] that Dr. Romo [another colleague] has a bias against [Plaintiff]" but never responded when asked to share evidence supporting the accusation. *Id.* Additionally, the Letter noted Plaintiff "leveled an unfounded accusation against [Dr. Pampinella]" to the Chair of the Academic Senate and to the Provost. *Id.* The accusation was that Dr. Pampinella was "pressuring [Plaintiff] to undergo a peer review in what was left of the Spring semester" when Dr. Pampinella was, by her account, merely sending an email to all faculty members that were preparing for a comprehensive review and scheduled for a class observation. *Id.* The email gave recipients the choice of foregoing the observation, having their remote teaching observed in May, or being observed in September. *Id.* "Although [Dr. Pampinella] tried to clarify" the original email, Plaintiff's reaction was allegedly "disrespectful and unwarranted." *Id.* The Letter stated:

> Your pattern of verbal aggression, disrespectful behavior, and unreasonable resistance to communication not only goes against university policy, but is also in conflict with the Civility Code and negatively impacts our department, creating a hostile environment. . . . Moving forward, it is my expectation that you will refrain from making unfounded accusations and using aggressive and disrespectful language and tone in your interactions with colleagues, and will instead seek clarification when the content of a message is unclear to you and display civility and collegiality in any and all circumstances.

*Id.* at 3.[4]

---

[4] This concern regarding collegiality was noticed by prior chair, Dr. Ramsdell, though it never rose to a level meriting the issuance of a Letter of Concern. *See* ECF 26-7, at 8, 42:6–10 ("[O]n one occasion another faculty member sa[id] that his emails was really bothersome. . . . Really, really unprofessional."); *id.* at 9, 46:7–21 ("I will say, though, . . . that I also had emails from [Plaintiff] that, um, um, were not pleasant to get, let me just put it that way. You know, sometimes, most of the time he was, he, his e-mails were very courteous . . . . But then there were once in a while these zingers that he would send and sometimes it would be like a bit of a rant, like something that had really upset him and he just like wrote about it right away but the tone of it was such that it made me feel like okay, something has been done wrong here and . . . I'm being pressured to fix it somehow.").

The Letter noted that "the behavior displayed and any measures [Plaintiff may] have taken to address this behavior will be put forth to the [Promotion, Tenure/Reappointment and Merit] committee for its consideration in its decision about [Plaintiff's] merit, reappointment, promotion, tenure, and/or comprehensive review." *Id.*

### 3. Plaintiff Files a Letter of Grievance in Response to the Inclusion of the Letters of Concern and Warning in his Promotion Materials.

After receiving the two June 26, 2020 letters, Plaintiff filed a grievance with the University's Faculty Grievance and Mediation Committee ("Faculty Grievance Committee"). *See* ECF 26-16, at 2 (objecting to Dr. Pampinella's "very ag[g]resive personal attack against [Plaintiff]"). Plaintiff sought to have the June 26, 2020 letters excluded from his promotional materials or to have his own letter of grievance included so the members of the promotional committee "may have both perspectives, for fairness." *Id.* Plaintiff's perspective was that "Dr. Pampinella was "a new, unexperienced Chair who ha[d] shown an irrational personal aversion against [Plaintiff], overreacting often, overwhelming [Plaintiff] with threatening emails, exaggerating and distorting all [Plaintiff] sa[id] or d[id]." *Id.* (writing that "every time [Plaintiff] tr[ied] to defend [him]self [Dr. Pampinella] call[ed] that an intolerable offense and a 'verbal aggression'"). Plaintiff also wrote that Dr. Pampinella

> also sends me often several emails in the same day; since my priority are my students' emails, at times I must leave some of her emails for the following day, and then she complains bitterly because I did not email back soon enough, and threatens me with reporting me to the authorities. This pattern of drama, exaggeration and distortion is a clear display of personal aversion.

*Id.* With respect to the Letter of Warning about depriving students of their ADA accommodations, Plaintiff wrote:

> The two students accused me of discrimination of race and disability (both had severe mental illness). The investigation exonerated me completely from the unfounded accusation of discrimination or racism, but found me responsible for

8

two violations of the rules for students with disabilities: one asked me permission to record my class and I answered that, two months before, the Associate Dean had warned me very seriously that recording a class was illegal, so I found a note-taker for the student while we clarified the situation; and when some days later the Associate Dean clarified it in an email, I allowed the recording. The other student complained she did not have a keyboard for the exams; while she had been allowed to use it, she also told me in her first day of class that she did not need any keyboard; only after the semester was over and she did not like her grade, she complained.

*Id.* at 3. Plaintiff noted he "accept[ed] [his] sanction of mandatory training for this minor error"

and had already completed the mandatory ADA training. *Id.*

Plaintiff also addresses some of the specific incidents included in the Letter of Concern.

Regarding Dr. Romo's observation, Plaintiff wrote:

[L]ast February our peer observations coordinator was trying to do his job and was about to send a Spanish Associate Professor to my class for a second observation, Dr. Pampinella did something unprecedented: she ignored our coordinator and personally selected the only professor in our Department who has not spoken to me in ten years, Dr. Romo, to observe my class. Our former Chairs never did anything like that, because they wanted to show neutrality and fairness. Dr. Pampinella has also done this only with me, and with nobody else, which seems extremely unfair. Her claim of "your refusal to be observed in class" by this person is not true: I first complained politely to my Chair, begging her to send anybody else, or to follow our normal procedures and let the coordinator do his job. When she replied that it was her final decision, I then emailed our Dean, with copy to her, asking the same. And when Dean Terry told me that if Dr. Romo's observation was unfair I should just resort to the appeals committee, on March 10 I emailed Dr. Romo to invite her to observe my April 9 class (see attached). I could not foresee then that some days later we would all be asked to work from home because of COVID-19 and the Provost decided to waive that second observation, given the emergency. Therefore my Chair's accusation that I refused to accept to be observed is not true.

*Id.* Plaintiff accused Dr. Pampinella of "add[ing] drama" when she called his language

"disrespectful," his tone "unwarranted," and by labeling his behavior "a matter of concern to the

effective functioning of the department." *Id.* Plaintiff wrote:

I never used any foul language, called anybody names or anything like that. I simply said this professor did not speak to me for ten years, which obviously implies a bias, and we should look for neutrality and impartiality in peer

9

observations. That is not "disrespectful", it is just a fact; and the Department functions effectively, so that sentence is not true.

*Id.* Plaintiff maintained that he "never create[ed] any hostility nor attack[ed] anybody; [Plaintiff] simply defend[ed] [him]self." Plaintiff asserted that the letters were "an attempt to ruin [his] promotion, and to make [him] feel intimidated and humiliated." *Id.*

On September 16, 2020, the Faculty Grievance Committee issued its decision. ECF 26-17. .The Committee concluded that the department chair had a right to include these letters in the binder of his promotion materials, and Plaintiff also had the right to include his own letter in the binder. *See id.*

> ### 4.   The PTR Committee Votes Against Promoting Plaintiff to the Position of Full Professor.

On October 2, 2020, the department's Promotion, Tenure and Reappointment ("PTR") Committee "voted 4-1 against promotion" of Plaintiff to the position of Full Professor. ECF 26-18 (summarizing the PTR Committee's vote in a letter from PTR Chair to the University's Provost). The PTR Committee found that while Plaintiff had a "sterling scholarly record," he "did not meet expectations in either of the two other categories under consideration—teaching and service." *Id.* at 6.

The PTR Committee acknowledged that Plaintiff received many laudatory teaching evaluations, but there were "also a few disturbing comments, that the committee could not disregard." *Id.* at 3. "For example, one student wrote: 'This was the absolute worst course experience of my life and my time at Towson University. I've never met such an angry, narcissistic, misogynistic, racist, hateful professor before. [. . .] He would talk about his personal life [and make inappropriate references to personal matters].'" *Id.* (former alteration in original, latter alteration by the Court). Among the negative comments, the terms "rude" and "belittling,"

10

were recurring, and there were numerous mentions of Plaintiff's "temper" or "hostility" and lack of availability for students. *Id.* Thus, in the "teaching" area of evaluation, the Committee concluded that "[d]espite the overwhelmingly glowing evaluations in [Plaintiff's] file, there was also evidence of comportment that does not meet with departmental expectations for a professor at any rank." *Id.* The findings of the OIIE regarding the denial of ADA accommodations to students was also another data point the PTR Committee relied upon. *See id.* at 3–4.

Additionally, the PTR Committee learned of a third unrelated incident with a student based on correspondence from Associate Dean Karen Eskow. *See id.* ("[I]t appears that there was a complaint against [Plaintiff], that went to the level of the Dean's office, related to "recording [a student] without consent in fall 2018."). The PTR Committee referenced Plaintiff's response and noted that Plaintiff "continues to claim in his most recent documents that he could not differentiate between the act of a professor recording a student without their consent and a student with [] accommodations being allowed to record lectures, with the instructor's prior knowledge." *Id.*

The PTR Committee also considered whether there had been improvement that met departmental and University expectations and agreed, in part based on Plaintiff's "Letter of Grievance," that "[Plaintiff] had not drawn the right lessons from these incidents." *Id.* This conclusion was also informed by Plaintiff's narrative statement, in which Plaintiff discounted negative student reviews by referring to the students as "suffering from mental illness." *Id.* (quoting Plaintiff's narrative as saying "[o]n a rare occasion, I have had a class with more negative than positive, where the challenge of having 50% of students suffering from mental illness might have played an important role."). Additionally, the Committee noted that when uploading his promotional materials Plaintiff failed to redact the names of the students that had

reported his conduct regarding disability accommodations. *Id.* The committee members unanimously agreed that Plaintiff's language about the students "did not meet the expectations of the department or the university" and expressed "doubt" about Plaintiff's "understanding of the seriousness of the accusations" given his "lack of consideration regarding the confidential nature of the report and the identities of the students involved." *Id.* at 5. "The committee" noted that it "wanted to send a clear message, to [Plaintiff], to our students and to other faculty, that the findings of the investigations and the language used by [Plaintiff] to describe his students cannot be consistent with excellence in teaching." *Id.* at 6.

The PTR Committee separately addressed the Letter of Grievance Plaintiff filed in his binder and noted "several members of the committee commented that [the] tone recalled negative comments found in student evaluations that speak of belittling, disrespectful, and aggressive language." *Id.* at 6.

The PTR Committee also responded to Plaintiff's accusation that it was "unprecedented" for Dr. Pampinella to select Dr. Romo as his observing professor by noting that "it is the practice in our department for the coordinator of class observations to meet with the chair. They decide together who will observe the classes of those who need to have peer evaluations. It is not at all unprecedented that the chair be involved in this process, as [Plaintiff] asserts." *Id.* at 7. The PTR Committee also took into consideration collegiality, and "whether [Plaintiff] has shown evidence that he treats his students and his colleagues in a professional and respectful way." *Id.*

After the vote against promotion by the Department's PTR Committee, the College of Liberal Art's ("CLA") Promotion, Tenure/Reappointment and Merit ("PTRM") Committee considered Plaintiff's promotion request. ECF 26-19, at 2-4 (summarizing findings in a letter

12

from PTRM Chair to the University's Provost). "The committee voted 2-8 with the majority

voting against promotion." *Id.* at 2. The PTRM Chair reported that

> the majority of the committee expressed significant concern about both the
> misconduct identified in the OIIE investigation and [Plaintiff]'s response to the
> findings. The OIIE investigation identified specific harm experienced by students
> in the case, including below-passing grades on weekly assignments that adjusted
> to A's once the student was permitted to use the ADS-approved accommodations
> originally denied by [Plaintiff]. [Plaintiff]'s dismissal of the seriousness of the
> OIIE findings, which he referred to as a "minor error" and his contention that the
> students in question suffered from mental illness—comments expressed in his
> Letter of Grievance, which he included in his promotion materials—were of equal
> concern.

*Id.* at 3. Ultimately, "[t]he overwhelming majority of the committee expressed the opinion that

the documents related to the OIIE finding and the Letter of Censure were evidence that

[Plaintiff] had deviated from the values of the University." *Id.* at 3–4. The majority of the CLA

PTRM Committee "concurred with the Foreign Languages department, that there ha[d] been

insufficient time to gauge improvement regarding this misconduct." *Id.* at 4.

### 5.   Plaintiff Appeals the University's Promotional Decision.

Plaintiff appealed the University's promotional decision, *see* ECF 26-21, at 2 (noting the

appeal). The decision to not promote Plaintiff was affirmed by the Dean of the CLA, Chris J.

Chulos, Ph.D., ECF 26-20, at 2–3 (agreeing with the promotional decision by noting that

Plaintiff's reference to the OIIE misconduct as "minor" and Plaintiff's "blam[ing]" of students

for their supposed mental illness reflected that insufficient time had passed to "gauge" Plaintiff's

improvement). The decision was also affirmed by the University's Provost, Melanie L.

Perreault, Ph.D. ECF 26-21, at 2 (affirming the decisions of the CLA PTRM and Dean Chulos).

### 6.   Plaintiff Files Grievances in 2021 with the MCCR.

On September 3, 2021, Plaintiff filed a Charge of Discrimination with the Maryland

Commission on Civil Rights (the "MCCR Charge"). ECF 26-23. Plaintiff alleged that he "was

discriminated against based on [his] age (52 years old), national origin (Hispanic, Spain), and disability as well as retaliated against for engaging in a protected activity." *Id.* at 2. Specifically, Plaintiff noted that Dr. Pampinella has "continuously subjected [Plaintiff] to ageist, national origin based, disability-related, and retaliatory harassment, in the form of, but not limited to, constantly micromanaging [Plaintiff], criticizing [him] in public, forcing [him] to attend meetings in the morning, and pressing [him] to resign." *Id.* at 3. The MCCR complaint was cross-filed with the United States Equal Employment Opportunity Commission, which ultimately issued a Notice of Right to Sue on March 29, 2022. *See* ECF 1, at 2–3 ¶ 4.

7.     Plaintiff Received an Additional Letter of Warning and Files Additional Grievances in 2021 and 2022.

On December 6, 2021, while the MCCR Charge was pending, Plaintiff filed a grievance against Dr. Pampinella with the University's Faculty Grievance and Mediation Committee. ECF 26-24, at 2. Plaintiff alleged that during a remote monthly department meeting on December 3, 2021, Plaintiff attempted to speak but Dr. Pampinella "and another professor (Dr. Leticia Romo) bullied [Plaintiff] by raising their voices over [his]." *Id.* Dr. Pampinella provided a written response in which she explained that Plaintiff was denied the opportunity to speak because at the prior department meeting, Plaintiff had divulged confidential information on the record. *See* ECF 26-25, at 2–3 (summarizing Dr. Pampinella's response).

On January 21, 2022, the Faculty Grievance Committee provided a written response, reiterating "two important principles at work in this situation: confidentiality and the right to speak." *Id.* at 3. The Faculty Grievance Committee reminded Plaintiff that a "breach of confidentiality is unethical, can expose colleagues to unfair prejudices, and is a violation of university policy" and "strongly advise[d] against violation of confidentiality in any university setting." *Id.* at 3. Additionally, the Faculty Grievance Committee recognized "the right of an

individual member of the faculty to speak to colleagues in a formal departmental meeting" and "agree[d] that [Plaintiff's] right to speak was violated in this particular instance." *Id.* The committee "strongly recommend[ed] that the department chair allow [Plaintiff] time to speak up during faculty meetings for the purpose of offering non-confidential updates and reports from relevant university committees." *Id.*

Finally, in 2022, Plaintiff received a letter of warning relating to a "verified failure to demonstrate collegial behavior." *See* ECF 26-28 (Letter of Warning dated March 18, 2022). A colleague[5] reported Plaintiff's behavior to the OHR, which conducted an investigation and found that "[t]he majority of witnesses interviewed . . . reported that [Plaintiff was] disruptive and/or unprofessional in meetings during the academic year 2021–2022, including behavior such as raising [his] voice, talking over colleagues, and bringing up unrelated topics." ECF 26-28, at 2 (summarizing findings). The Letter also noted that at the department meeting on November 2021, Plaintiff "disclos[ed] confidential information about faculty grievances." *Id.* Despite being "cautioned during the department meeting not to breach confidentiality," Dr. Pampinella wrote "at the next department meeting in December [Plaintiff] insisted on the inclusion of the confidential information in the meeting minutes." *Id.*

Plaintiff filed a grievance with the Faculty Grievance Committee on April 12, 2022, contesting the factual underpinnings of the Letter and requesting the Letter be removed from Plaintiff's "PTRM portfolio and any binder of any promotion [Plaintiff] may attempt in the future." ECF 26-29, at 5.

---

[5] Identifying information about this colleague and the colleague's OHR complaint were filed under seal. ECF 28 (complaint); ECF 29 (OHR summary of investigation and conclusions); ECF 30 (deposition of complainant).

The Faculty Grievance Committee responded on June 2, 2022, encouraging Plaintiff and Dr. Pampinella to "sit down in earnest to talk about moving forward in the aftermath of the OHR investigation and a history of interpersonal conflict" but concluded it could not make any findings about the veracity of the OHR reports, and could only permit Plaintiff to submit his own rebuttal to the March 18, 2022 letter. ECF 26-30, at 3.

## B.    Procedural History

Plaintiff filed the present suit on June 14, 2022. ECF 1. Plaintiff initially asserted seven causes of action: (1) retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") at 42 U.S.C. § 2000e et seq., ECF 1, at 6; (2) disability discrimination in violation of the Americans with Disabilities Act of 1990 ("ADA") as amended 42 U.S.C. § 12101 et seq., *id.* at 7; (3) retaliation in violation of the ADA, *id.* at 9; (4) age discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), as amended, 29 U.S.C. § 621 et seq., *id.* at 11; (5) retaliation in violation of the ADEA, *id.* at 12; (6) discrimination in violation of the Maryland Fair Employment Practices Act ("MFEPA") at Md. Code Ann., State Gov't § 20-601 et seq., *id.* at 13; and (7) retaliation in violation of MFEPA, *id.* at 14.

Defendant filed a Motion for Partial Dismissal of Complaint, ECF 6, seeking dismissal of Counts IV, V, VI, and VII. ECF 6. Thereafter, Plaintiff voluntarily dismissed Counts IV and V on August 26, 2022. *See* ECF 11 (voluntarily dismissing of Counts IV and V with prejudice); ECF 12 (approving voluntary dismissal). Finally, the Court dismissed Counts VI and VII, ECF 14, as Plaintiff did not oppose the dismissal of those counts, ECF 13. Thus, the only remaining claims are retaliation in violation of Title VII (Count I) and discrimination and retaliation in violation of the ADA (Counts II and III, respectively).

On October 18, 2023, this case was transferred to the undersigned. Thereafter, Defendant filed the present Motion for Summary Judgment on November 8, 2023. ECF 26. Plaintiff filed his opposition on December 18, 2023, ECF 39, and a memorandum in support, ECF 40, and Defendant filed its reply on January 23, 2024, ECF 43. The motion is fully briefed and ripe for disposition.

## II.   LEGAL STANDARDS

### A.   Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

"A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007), and the Court cannot weigh evidence, *Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 780 (4th Cir. 2023) (citing *Variety*

17

*Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659–60 (4th Cir. 2018)). For this reason, summary judgment ordinarily is inappropriate when there is conflicting evidence because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002). At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)).

### B.   Summary Judgment in the Title VII Context

A plaintiff may meet her summary judgment burden of establishing a genuine dispute of material fact either by offering direct or circumstantial evidence, or by proceeding under the scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996). *McDonnell Douglas* sets out a three-step scheme in which the plaintiff bears the initial burden of establishing a prima facie case of discrimination by a preponderance of the evidence. *Id.* If the plaintiff meets this burden, the defendant-employer can rebut the presumption of discrimination by presenting evidence of a legitimate, non-discriminatory reason for its employment actions. *Id.* If the defendant-employer provides this reason, the presumption of discrimination "drops out of the picture" and the burden shifts back to the plaintiff to demonstrate that the defendant's rationale is pretextual. *Id.* At bottom, the "plaintiff always bears the ultimate burden of proving that the employer intentionally discriminated against her." *Id.* (citing *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

### III. __ANALYSIS__

Defendant moves for summary judgment on all remaining counts arguing that (1) Plaintiff's Counts II and III are barred by the doctrine of sovereign immunity, and (2) Plaintiff's Count I should be dismissed because Plaintiff has failed to establish a prima facie case of retaliation in violation of Title VII. ECF 26, at 3–4. Plaintiff counters that Counts II and III are not barred by the doctrine of sovereign immunity due to an express congressional abrogation of sovereign immunity, ECF 39, at 2; and that Plaintiff has established a prima facie case of retaliation under Title VII, *see id.* at 1. For the reasons explained herein, the Court agrees with Defendant and Defendant's Motion will be granted.

### A. __Counts II and III are Barred by the Doctrine of Sovereign Immunity.__

In Counts II and III of his Complaint, Plaintiff asserts claims of disability discrimination and retaliation under the ADA. ECF 1, at 7–12. The ADA prohibits employers from discriminating against otherwise "qualified individual[s] on the basis of disability." 42 U.S.C. § 12112(a)–(b). Among the forms of discrimination prohibited by the statute are (1) imposing an adverse action upon an employee due to their disability; (2) retaliating against an employee for engaging in protected activities related to disability discrimination; (3) creating a hostile work environment; and (4) failing to reasonably accommodate an employee with a disability. *See Israelitt v. Enter. Servs. LLC*, 78 F.4th 647, 653 (4th Cir. 2023) (recognizing each type of claim under the ADA).

Defendant argues these claims are barred by the doctrine of sovereign immunity because there has been no valid waiver or abrogation of State immunity. ECF 26-1, at 15–19. Plaintiff counters that the ADA contains a congressional abrogation of State immunity, ECF 40, at 20–21, that Maryland law waives immunity, and that Defendant's conduct in this litigation constitutes a

waiver of immunity, *id.* at 22–23.  As explained below, Plaintiff's rationales in favor of finding

waiver or abrogation are legally incorrect and Counts II and III will be dismissed.

     1. <u>Law on the Doctrine of Sovereign Immunity</u>

   The Eleventh Amendment confirms a principle that is "foundational to our constitutional

system," *Doe v. Cmty. Coll. of Balt. Cnty.*, 595 F. Supp. 3d 392, 410 (D. Md. 2022) (quoting

*Cunningham v. Lester*, 990 F.3d 361, 365 (4th Cir. 2021)), that "[i]t is inherent in the nature of

sovereignty not to be amenable to the suit of an individual without its consent." *Seminole Tribe*

*of Fla. v. Florida*, 517 U.S. 44, 54 (1996) (internal citation and quotation marks omitted);

*Stewart v. North Carolina*, 393 F.3d 484, 488 (4th Cir. 2005) (noting sovereign immunity

"predated" the adoption of the Eleventh Amendment, which "confirmed, rather than established,

sovereign immunity as a constitutional principle" (quoting *Alden v. Maine*, 527 U.S. 706, 728–29

(1999))); *see also Md.-Nat'l Cap. Park & Planning Comm'n v. Kranz*, 521 A.2d 729, 731 (Md.

1987) ("[T]he doctrine that the State of Maryland and state agencies are generally immune from

suits, unless the immunity has been waived by the General Assembly, 'is firmly embedded in the

law of Maryland.'" (quoting *Austin v. City of Baltimore*, 405 A.2d 255, 256 (Md. 1979))).

   "The immunity that the Eleventh Amendment confers extends also to state agencies and

instrumentalities." *Palotai v. Univ. of Md. Coll. Park*, 959 F. Supp. 714, 716 (D. Md. 1997).

The Defendant is a public institution of higher education, Md. Code Ann., Educ. § 12-101(a),

and one of ten "[c]onstituent institutions" of the University System of Maryland.  *Id.* § 12-

101(b)(6) (listing all constituent institutions).  Each of the ten constituent institutions that make

up the University System of Maryland is "an arm of the State partaking of the State's Eleventh

Amendment immunity." *Palotai*, 959 F. Supp. at 716 (citation omitted)); *see, e.g., id.* (noting the

University of Maryland, one of Maryland's constituent institutions is an arm of the State and

immune from suit); *Borkowski v. Baltimore County*, 414 F. Supp. 3d 788, 805 (D. Md. 2019) ("UMBC, as a constituent institution of the University System of Maryland, [is] considered [an] instrumentalit[y] of the State for immunity purposes.").

However, "Eleventh Amendment sovereign immunity is not absolute." *Palotai*, 959 F. Supp. at 716. "State sovereign immunity may be abrogated in two limited circumstances: [1] a state may unequivocally express its consent to be sued in federal court, or [2] with an unequivocal expression of intent, Congress may abrogate sovereign immunity with a valid exercise of its powers. *Paul v. Blue Cross Blue Shield of N.C.*, Civ. No. 23-354, 2024 WL 1286208, at *4 (E.D.N.C. Mar. 26, 2024) (collecting cases); *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976) (holding that for purposes of enforcing the Fourteenth Amendment, Congress may "provide for private suits against States or state officials which are constitutionally impermissible in other contexts"); *Brown v. N.C. Div. of Motor Vehicles*, 166 F.3d 698, 702 (4th Cir. 1999) ("The Supreme Court has held that Congress has a limited power to abrogate immunity."); *Brown v. Dep't of Pub. Safety & Corr. Servs.*, 383 F. Supp. 3d 519, 553 (D. Md. 2019) ("The state may waive its defense of sovereign immunity." (citing *Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 491 (4th Cir. 2005)).[6]

The burden of proof "falls to an entity seeking immunity as an arm of the state."[7] *Cmty. Coll. of Balt. Cnty.*, 595 F. Supp. 3d at 410 (quoting *Williams v. Big Picture Loans, LLC*, 929

---

[6] Also, "the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004). However, this exception to immunity is inapplicable here where Plaintiff does not seek injunctive relief and "does not name as defendants any officials of the State of Maryland." *Lee-Thomas v. Prince George's Cnty. Pub. Sch.*, 666 F.3d 244, 249 (4th Cir. 2012).

[7] As the Fourth Circuit explained in *Cunningham v. General Dynamics Information Technology, Inc.*, "sovereign immunity deprives federal courts of jurisdiction to hear claims[.]" 888 F.3d 640, 649 (4th Cir. 2018) (quoting *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 207 (5th Cir. 2009)); *TFWS, Inc. v. Schaefer*, 242 F.3d 198, 204 (4th Cir. 2001) ("The Eleventh Amendment

F.3d 170, 176 (4th Cir. 2019)). Therefore, Defendant bears the burden of establishing that Congress has not abrogated State immunity, and that Maryland has not waived its immunity to suit.

2. Plaintiff's Arguments in Favor of Abrogation

Plaintiff offers three rationales for why the Eleventh Amendment should not bar Counts II and III: (1) the ADA contains an express Congressional abrogation of State immunity for suits brought pursuant to the ADA, ECF 40, at 20–21; (2) Defendant consented to suit via litigation conduct, *id.* at 22–23; and (3) a State law, CJP § 5-518(c), expressly waives immunity, *id.* at 23. Defendant criticizes Plaintiff's ADA argument for conflating Titles I and II of the ADA and contradicting dispositive Supreme Court precedent in *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356 (2001). *See* ECF 26-1, at 16–17; ECF 43, at 2–3. Additionally, Defendant argues that merely participating in a federal lawsuit does not constitute a waiver of sovereign immunity, ECF 43, at 4, and that CJP § 5-515(c) is irrelevant because it applies only to agencies, *id.* at 5. The Court agrees with Defendant's arguments and Counts II and III will be dismissed.

i. *42 U.S.C. § 12202 does not abrogate State immunity to suit under Title I of the ADA.*

First, Plaintiff argues that the ADA, specifically 42 U.S.C. § 12202, contains an express abrogation of State immunity. ECF 40, at 20–21. Defendant counters that while this statute may

grants 'an unconsenting State [immunity] from suits brought in federal court by her own citizens as well as by citizens of another State.'" (quoting *Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974))); *Doe v. Cmty. Coll. of Balt. Cnty.*, 595 F. Supp. 3d 392, 410 (D. Md. 2022) ("[T]he defense of sovereign immunity is a jurisdictional bar." (citing *Cunningham*, 888 F.3d at 649)); *Kitchen v. Upshaw*, 286 F.3d 179, 183 (4th Cir. 2002) (noting Eleventh Amendment immunity "limits the Article III jurisdiction of the federal courts to hear cases against States and state officers acting in their official capacities"); *see also Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014) (noting that "[u]nlike subject matter jurisdiction which cannot be waive, a State can always waive its immunity and consent to be sued in federal court").

purport to expressly abrogate State immunity, the Supreme Court held in *Garrett* that this was not a valid abrogation. *See* ECF 26-1, at 16–17 (citing 531 U.S. 356, 374 (2001)); ECF 43, at 2–3 (same). The Court agrees with Defendant.

In order for Congress to validly abrogate State immunity to suit, Congress must (1) "unequivocally express its intent to abrogate"; and (2) "act according to a valid exercise of power in abrogating state immunity." *Jamison v. Delaware*, 340 F. Supp. 2d 514, 516–17 (D. Del. 2004) (quoting *Lavia v. Pennsylvania*, 224 F.3d 190, 196 (3d Cir. 2000)); *Brown*, 166 F.3d at 702–03 (citing *Green v. Mansour*, 474 U.S. 64, 68, (1985) and *Seminole Tribe,* 517 U.S. at 55).

In *Garrett*, the Supreme Court considered "whether employees of the State of Alabama may recover money damages by reason of the State's failure to comply with the provisions of Title I of the Americans with Disabilities Act of 1990 (ADA or Act), 104 Stat. 330, 42 U.S.C. §§ 12111–12117" and held that "such suits are barred by the Eleventh Amendment." 531 U.S. at 360. Noting that the Supreme Court had previously held that § 5 of the Fourteenth Amendment necessarily limits the Eleventh Amendment, *id.* (citing *Fitzpatrick*, 427 U.S. at 456), the *Garrett* Court explained that "the ADA can apply to the States only to the extent that the statute is appropriate § 5 legislation." *Id.* (footnote omitted).

Section 5 of the Fourteenth Amendment grants Congress the power to enforce the substantive guarantees contained in § 1 by enacting "appropriate legislation." U.S. Const. amend. 14 § 5; *see also id.* § 1 ("No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."). "Congress' § 5 authority is appropriately

23

exercised only in response to state transgressions." *Garrett*, 531 U.S. at 367. Because the legislative record for the passage of the ADA did not identify "a pattern of irrational state discrimination in the employment against the disabled," the ADA cannot be construed as remediating unconstitutional discrimination, and therefore, does not abrogate state immunity. *Id.* at 368.

Plaintiff never contends with *Garrett* and instead cites to *Mason v. City of Huntsville*, ECF 40, at 21, a case where the "Plaintiffs assert[ed] that the City of Huntsville [wa]s in violation of the ADA, *specifically Title II* and various regulations under the Act." *Mason v. City of Huntsville, Ala.*, No. CV-10-S-02794-NE, 2012 WL 4815518, at *3 (N.D. Ala. Oct. 10, 2012) (emphasis added). "Title II of the ADA governs discrimination in the provision of public services." *Id.* at *5; *see* 42 U.S.C. § 12132. Title I of the ADA, however, governs disability discrimination in employment and is at issue in the present case. *See Garrett*, 531 U.S. at 360 (citing 42 U.S.C. § 12112(a)). In sum, because Defendant identifies dispositive caselaw that Plaintiff does not distinguish,[8] the Court agrees with Defendant that § 12202 is not a valid abrogation of State immunity under Title I of the ADA. ECF 43, at 3.

---

[8] Plaintiff ignores numerous opinions of the Fourth Circuit Court of Appeals and of this Court that hold that Title I ADA claims for monetary damages are barred by the Eleventh Amendment and sovereign immunity. *See, e.g., McCray v. Md. Dep't of Transp.*, 741 F.3d 480, 483 (4th Cir. 2014) ("Sovereign immunity has not been abrogated for . . . ADA Title I claims."); *Squire v. Md. Transit Admin.*, Civ. No. 22-02493-JRR, 2023 WL 4593373, at *9 n.4 (D. Md. July 18, 2023) (affirming that "sovereign immunity has not been abrogated for ADA Title I claims"); *Johnson v. Md. Dep't of Lab., Licensing, & Regul.*, 386 F. Supp. 3d 608, 614 (D. Md. 2019) ("Plaintiff's Title I ADA claim for monetary damages must be dismissed because it is barred by the Eleventh Amendment to the United States Constitution and the doctrine of sovereign immunity."); *Fenicle v. Towson Univ.*, Civ. No. ELH-18-0917, 2018 WL 5885526, at *10 (D. Md. Nov. 8, 2018) ("Indeed, Fenicle seems to recognize that his claim for monetary relief under Title I of the ADA is precluded by the Eleventh Amendment.").

*ii.      Defendant did not unequivocally waive its immunity to suit.*

Next, Plaintiff argues Defendant consented to suit by participating in this litigation. *See* ECF 40, at 22. Plaintiff argues Defendant "voluntarily invoke[ed] federal jurisdiction," *id.* (citing *Vas Cath, Inc. v. Curators of the Univ. of Mo.*, 473 F.3d 1376, 1378 (Fed. Cir. 2007), by "maintain[ing] a claim in federal court," *id.* (citing *Genentech, Inc. v. Eli Lilly & Co.*, 998 F.2d 931, 935 (Fed. Cir. 1993)). Additionally, Plaintiff argues Defendant waived its sovereign immunity defense by failing to raise it in its motion to dismiss. *Id.* Finally, Plaintiff argues "Defendant engaged in the litigation of this matter by propounding discovery on Plaintiff." *Id.* at 23.

Defendant counters that Rule 12 of the Federal Rules of Civil Procedures provides only a limited number of defenses that will be waived if not raised in a responsive pleading, and Eleventh Amendment immunity is not one of them. *See* ECF 43, at 4 (citing Fed. R. Civ. P. 12(b)). Thus, Defendant argues it properly raised the affirmative defense of Eleventh Amendment immunity in its Answer and was not required to raise it in its motion to dismiss. *Id.* (citing ECF 16, at 8–9 ¶ 1). The Court agrees with Defendant that Defendant did not waive its sovereign immunity defense by failing to include the defense in Defendant's motion to dismiss.

Additionally, Defendant argues that Plaintiff's suggestion that Defendant "voluntarily invok[ed]" federal jurisdiction is erroneous because Defendant did not remove this action to federal court and has not made any other unequivocal expression of waiver. *Id.* at 5. While "sovereign immunity is a personal privilege which [a State] may waive at pleasure," *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999) (internal citation and quotation marks omitted), the "test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one," *id.* (citation omitted); *see also*

25

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984) (noting a State's consent to suit must be "unequivocally expressed"); *e.g.*, *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 620 (2002) (holding that although "the State was brought involuntarily into the case as a defendant in the original state-court proceedings" that "the State then voluntarily agreed to remove the case to federal court," thereby constituted a voluntary invocation of federal jurisdiction).

The "case law is clear that 'because of its jurisdictional nature, a court ought to consider the issue of Eleventh Amendment immunity at any time, even sua sponte.'" *McCray v. Md. Dep't of Transp.*, 741 F.3d 480, 483 (4th Cir. 2014) (quoting *Suarez Corp. Indus. v. McGraw*, 125 F.3d 222, 227 (4th Cir. 1997)). There are, however, "limits to how long a state may wait before claiming immunity." *McCray*, 741 F. 3d at 483. "For example, if a state loses a case on the merits after extensive discovery has taken place, it is inappropriate for the state to then claim sovereign immunity." *Id.* (citing *Ku v. Tennessee*, 322 F.3d 431, 435 (6th Cir. 2003)). Here, discovery had commenced but was going to proceed regardless given that Plaintiff alleged an additional violation of the law not barred by immunity or otherwise dismissed. *See* ECF 1, at 6 (Count One). Further, there has been no ruling on the merits of Plaintiff's ADA claims. Plaintiff cites to no cases that support the argument that merely responding to litigation by conducting discovery constitutes an "unequivocal" expression of a state's waiver of immunity to suit or voluntary invocation of federal jurisdiction. For example, Plaintiff cites *Vas Cath, Inc. v. Curators of the Univ. of Mo.*, which involved a university *initiating* a proceeding against a competing patent applicant with the Patent and Trademark Office and ultimately held that because it had initiated the claim, the university could not then assert Eleventh Amendment immunity to bar the competing patent applicant's appeal of that adjudication. *See* 473 F.3d at

1378. Further, Plaintiff points the Court to *Genentech, Inc. v. Eli Lilly & Co.*, which involved statutory abrogation of immunity to patent litigation, not conduct litigation waivers. 998 F.2d 935. Thus, on the facts presented here, the Court agrees that Defendant did not waive its immunity to suit by raising it for the first time as an affirmative defense or by participating in discovery and taking depositions when it would have had to do so regardless of whether the challenged counts remained.

iii. *CJP § 5-515(c) does not constitute a waiver of State Sovereign Immunity by Defendant.*

Finally, Plaintiff argues that the Maryland General Assembly abrogated the State of Maryland's immunity to suit up to $100,000 in CJP § 5-515(c).[9] ECF 40, at 23. CJP § 5-518(c) provides: "[a] county board of education may not raise a defense of sovereign immunity to any claim of $400,000 or less." *Id.* Defendant argues "the University is not a 'county board of education.' Thus, this statute is inapplicable." ECF 43, at 5. The plain language of the statute supports Defendant's interpretation because, as Defendant notes, the University is clearly "not a 'county board of education.'" ECF 43, at 5 (quoting CJP § 5-518(c)). Further, the lone case cited by Plaintiff to support its argument, *Zimmer-Rubert v. Bd. of Educ. of Baltimore Cnty.*, features—as its caption suggests—a lawsuit against "the Board of Education for Baltimore County," and thus fails to stretch the clear boundaries of CJP § 5-518(c) to somehow reach the Defendant. 947 A.2d 135, 137 (Md. App. 2008). Plaintiff's argument on this point is without merit.

In sum, Defendant has established an entitlement to sovereign immunity as to Counts II and III because Congress has not validly abrogated state immunity to ADA claims under Title I,

---

[9] Plaintiff's reference to a $100,000 cap on the State's waiver of immunity appears to mistakenly reference a prior version of CJP § 5-518 (1974, 2001 Repl.Vol.). *Cf.* CJP § 5-518(c) (2023) (including a cap of $400,000).

*supra* Section III.A.i, Defendant has not waived immunity via its conduct in this litigation, *supra* Section III.A.ii, and the Maryland General Assembly has not waived immunity by statute, *supra* Section III.A.iii. Therefore, Counts II and III are dismissed.

**B.    Summary Judgment is Granted Against Plaintiff on Count I.**

In Count I of his Complaint, Plaintiff asserts a claim of retaliation in violation of Title VII. ECF 1, at 6. Title VII of the Civil Rights Act prohibits status-based discrimination based on an employee's personal characteristics such as "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a); *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346–47 (2013); *Strothers v. City of Laurel*, 895 F.3d 317, 326–27 (4th Cir. 2018). "Title VII also bars retaliation based on an employee's opposition to conduct made unlawful by Title VII, or for participating in a Title VII investigation or proceeding." *Angelini v. Baltimore Police Dep't*, 464 F. Supp. 3d 756, 776 (D. Md. 2020) (citing 42 U.S.C. § 2000e–3). An employer retaliates against an employee in violation of Title VII when the employer takes an adverse employment action against the employee because of the employee's participation in a Title VII action. *Id.* at 776–77.

A plaintiff must satisfy three elements to establish a prima facie retaliation case: "(1) that she engaged in a protected activity; (2) that her employer took an adverse employment action against her; and (3) that there was a causal link between the two events." *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405–06 (4th Cir. 2005). Participation in a Title VII process constitutes protected activity when the person allegedly facing retaliation "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing" under Title VII. 42 U.S.C. § 2000e–3(a). Defendant argues that Plaintiff cannot establish a prima facie

case of retaliation because Plaintiff has failed to establish a causal connection between any adverse action and protected activity. ECF 26-1, at 20–27.

1.   Clarifying the "Protected Activity"

First, the only protected activity Plaintiff identifies is his filing of a charge of discrimination with the MCCR and EEOC on September 3, 2021 alleging that he experienced national origin-based discrimination. ECF 26-23, at 2; *see also* ECF 26, at 22 (conceding this is a protected activity). Up until September 3, 2021, Plaintiff may have engaged in other *ADA-protected* activity, such as requesting accommodations in 2019, however he failed to raise any allegation of national origin discrimination until his 2021 MCCR Charge. *See* ECF 26, at 22 n.8.; 42 U.S.C. § 2000e–2(a) (prohibiting discrimination on the basis of "race, color, religion, sex, or national origin," not disability status); *see, e.g., Burnett v. BJ's Wholesale Club,* Civ. No. JKB-22-02840, 2024 WL 1014074, at *8 (D. Md. Mar. 8, 2024), *aff'd*, No. 24-1228, 2024 WL 3042902 (4th Cir. June 18, 2024) ("To the extent Plaintiff contends that his disability status brings him under the protection of Title VII, that argument is unavailing, as the statute by its plain terms does not cover disability.").

Additionally, Plaintiff asserts that filing a grievance on December 6, 2021, constituted a protected activity. ECF 40, at 33. However, the Court is unpersuaded by this argument because the December 6, 2021 grievance itself does not suggest that it was lodged in objection to alleged discrimination in violation of Title VII. *See* ECF 26-24, at 2 (noting that "with this email, I would like to file a grievance against the current Chair of the Department . . .for the following reason: [s]uppresion of basic free speech"). Plaintiff does not present any evidence or testimony that he was prevented from speaking at the faculty meeting because of his national origin. *See* ECF 26-5, at 20 (making no mention of Plaintiff's national origin in describing the incident).

29

Notably, Plaintiff himself stated that he didn't believe his national origin was the reason why he was purportedly silenced. *See* ECF 40-1, at 76:13–19 (testifying that "speculating about the reasons for another person is very hard" when asked about why he believed Dr. Pampinella did not permit him to speak).

An "employee's belief that [he or she] was engaging in protected activity must be evaluated by reference to *objective* criteria." *Cosby v. S.C. Prob., Parole & Pardon Servs.*, 93 F.4th 707, 720 (4th Cir. 2024). "Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient" to constitute protected activity under Title VII. *Cosby*, 93 F.4th at 719 (citing *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 718 (7th Cir. 2018)). Given that the December 6, 2021 grievance does not mention national origin and because Plaintiff himself does not assert in his deposition testimony that he was protesting national origin discrimination when he filed the grievance, the Court cannot conclude its filing constituted protected activity. Therefore, the only "protected activity" that Plaintiff has identified is Plaintiff's filing of a MCCR charge on September 3, 2021. ECF 26-23.

2.     Clarifying the Adverse Employment Actions

Second, the Court must clarify the legally cognizable employment actions that may be treated as an "adverse employment action." *See Roberts v. Glenn Indus. Grp.*, Inc., 998 F.3d 111, 122–23 (4th Cir. 2021) ("An adverse employment action is a discriminatory act that 'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'" (quoting *Chang Lim v. Azar*, 310 F. Supp. 3d 588, 601 (D. Md. 2018))).

The only arguable adverse employment actions that came after Plaintiff's MCCR filing on September 3, 2021 are: (1) Plaintiff's allegation that Dr. Pampinella and Dr. Romo talked

over Plaintiff at a department meeting on December 3, 2021, *see supra* Section I.A.7; (2) Plaintiff's claim that a colleague submitted a complaint against Plaintiff, which caused Plaintiff to receive a Letter of Warning on March 18, 2022, *id.*; and (3) the allegation that Dr. Pampinella "expressly requested that the letter be included in Plaintiff's portfolio as an attempt to thwart Plaintiff's promotional opportunities," ECF 40, at 33. It may be debatable whether all of these acts constitute "adverse employment actions," but since the parties don't engage the issue and noting that Plaintiff's claim is addressed at other steps of the analysis, the Court will simply assume that these acts are adverse actions since they "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Israelitt v. Enter. Servs. LLC*, 78 F.4th 647, 656 (4th Cir. 2023) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57, 68 (2006)).

### 3. Causal Connection

The third element in a retaliation claim under Title VII requires a plaintiff to demonstrate that the protected activity was causally connected to the adverse action. *Strothers v. City of Laurel*, 895 F.3d 317, 335 (4th Cir. 2018). A causal connection exists when an employer takes a particular adverse action "*because* the plaintiff engaged in a protected activity." *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007) (emphasis in original) (quoting *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)). An employee may establish prima facie causation simply by showing that: "(1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee soon after becoming aware of such activity." *Strothers*, 895 F.3d at 336 (citing *Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994)); *see also Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989).

31

Plaintiff has not established that Dr. Pampinella or the colleague who issued a complaint

against him *knew* of his MCCR Charge. *See* ECF 40, at 31–33 (failing to include any citation to

the record alleging as much). In the Fourth Circuit, courts have "consistently required proof of a

decisionmaker's knowledge of protected activity to support a Title VII retaliation claim."

*Roberts*, 998 F.3d at 124. Plaintiff must, therefore, "show that the decisionmaker was aware of

the protected activity at the time the alleged retaliation occurred." *Id.* The only evidence of Dr.

Pampinella's knowledge comes from Dr. Pampinella's deposition, in which she testifies she was

made aware of a grievance filed against her on December 6, 2021 based on what allegedly

occurred at the December 3, 2021, department meeting. *See* ECF 26-8, at 6. However, as noted

above, the December 6, 2021 grievance was not a Title VII "protected activity" thus Plaintiff has

not demonstrated that Dr. Pampinella knew of the MCCR Charge prior to any alleged adverse

employment action and summary judgment is warranted on that basis alone.

           4.   Alternatively, Defendant has established legitimate, non-retaliatory reasons
               for its actions.

Defendant argues that summary judgment should be granted in Defendant's favor

because Defendant has offered legitimate, non-retaliatory reasons for the post-MCCR actions,

and Plaintiff has not established pretext. ECF 26-1, at 26–27. The Court agrees.

First, Defendant offers evidence that the reason Plaintiff was denied the opportunity to

speak at the December 3, 2021, department meeting was because Dr. Pampinella feared Plaintiff

would divulge confidential information, as he had allegedly done at the prior department

meeting. ECF 26-1, at 25 (citing ECF 26-8, at 6–7, 70:13–71:20). Dr. Pampinella testified that

she asked Plaintiff to email the agenda items that he wished to be communicated to the attendees

and that those items would be included in the minutes and sent to faculty members through

email. *Id.* at 7, 71:1–16. *see also* ECF 26-25. Plaintiff, however, testified that Dr. Pampinella

"didn't let [him] speak, and she ended the meeting in a very rude and, you know, incomprehensible way." ECF 40-1, at 76:2–4.

Plaintiff does not create a genuine dispute of material fact over whether he did, in fact, divulge confidential information at an earlier meeting. *See* ECF 40-1, at 3–50 (failing to contest disclosing confidential information).[10]   Title VII does not "immunize [employees] from the consequences of [their] grossly unprofessional conduct," including the unauthorized disclosure of confidential information. *Burton v. Bd. of Regents of Univ. of Wis. Sys.*, Civ. No. 17-36-JDP, 2020 WL 5304493, at \*1, 11 (W.D. Wis. Sept. 4, 2020) (finding a department's discipline of a faculty member for disclosure of confidential information was legitimate and non-retaliatory because disclosure of such information was "a gross violation of common-sense norms, which has the potential to cause embarrassment and lasting damage to department morale"), *aff'd*, No. 20-2910, 2022 WL 16948602 (7th Cir. Nov. 15, 2022).

Further, the Letter of Warning issued on March 18, 2022, came in response to investigative findings from the OHR, after interviews with eighteen witnesses. ECF 26-28. The OHR report indicated that a "majority of witnesses interviewed . . . reported that [Plaintiff] w[as] disruptive and/or unprofessional in meetings during the academic year 2021–2022, including behavior such as raising your voice, talking over colleagues, and bringing up unrelated topics." ECF 26-28, at 2 (summarizing findings).

---

[10] To be sure, Plaintiff does allege that there are disputes of material fact over other issues related to his relationship with Defendant. *See, e.g.*, ECF 40, at 10–11 (alleging a dispute as to whether Plaintiff violated "students' ADA rights" and whether he needed "mandatory ADA training"); *id.* at 12 (disputing whether Dr. Pampinella's letters "were nothing more than an attempt . . . to jeopardize Plaintiff's promotion"); *id.* at 16 (claiming there is a "dispute of material fact as to whether Dr. Pampinella's interference with Plaintiff's request to update his accommodations constitute[d] a violation of Plaintiff's rights"). But at no point does Plaintiff dispute that he divulged confidential information at a department-wide meeting.

To the extent Plaintiff suggests that his history of conflict with Dr. Pampinella supports his claim that Defendant's rationales are pretextual, this suggestion is unpersuasive. *See* ECF 40, at 33–34. The mere existence of a contentious working history between a supervisor and supervisee is not enough to turn a rationale, non-discriminatory action into a retaliatory Title VII violation because Title VII does not outlaw personality conflicts or even rude and unbecoming behavior. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (noting Title VII is not "a general civility code for the American workplace"); *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315–16 (4th Cir. 2008) ("[C]omplaints premised on nothing more than rude treatment by coworkers, callous behavior by one's superiors, or a routine difference of opinion and personality conflict with one's supervisor, are not actionable under Title VII.") (internal citations and quotation marks omitted). Plaintiff has not identified record evidence suggesting any connection between Dr. Pampinella's purported "aversion" to Plaintiff, *see* ECF 40-1, at 80, and Plaintiff's national origin.

At bottom, the "plaintiff always bears the ultimate burden of proving that the employer intentionally discriminated against [him]." *Evans*, 80 F.3d at 958 (citing *Tex. Dep't of Cmty. Affs.*, 450 U.S. at 253). Yet Plaintiff does not make comparisons to caselaw or cite to specific references in the record that would support the inference of retaliatory animus. *See* ECF 40, at 33–34. Thus, the Court concludes Plaintiff has not met his burden. Based on the record before the Court, Plaintiff has, at most, demonstrated that a personality conflict existed between himself and Dr. Pampinella. Such workplace disagreements, even significant ones, are not actionable under Title VII. *Oncale*, 523 U.S. at 80. Plaintiff has not established a genuine dispute as to whether Dr. Pampinella was motivated by retaliatory animus due to Plaintiff's filing of a MCCR Charge.

## IV.   CONCLUSION

For the foregoing reasons, Defendant's Motion is **GRANTED**.  Summary judgment is granted to Defendant as to Counts I, II, and III.

A separate implementing Order will issue.

Dated: <u>August 19, 2024</u>

/s/
Brendan A. Hurson
United States District Judge